**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 CR 409** |
| | ) | |
| **ERIC A. BLOOM and CHARLES K.** | ) | **Judge Ronald A. Guzman** |
| **MOSLEY,** | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Defendants Eric A. Bloom and Charles K. Mosley have been charged with 18 counts of: wire fraud in violation of 18 U.S.C. § 1343; investment adviser fraud in violation of 18 U.S.C. §§ 80b-6(1) and (2), 80b-17, and 2; and false statements to an employee benefit plan in violation of 18 U.S.C. §§ 1027 and 2.  In this motion, which the district judge referred to this Court for a Report and Recommendation, Defendant Bloom seeks an order requiring the government to provide him with a bill of particulars.  For the reasons set forth here, this Court recommends that the motion for a bill of particulars be granted in part and denied in part.

## BACKGROUND

Defendant Bloom was the Chief Executive Officer and part owner of Sentinel Management Group, Inc., a corporation that managed short-term cash investments of futures commission merchants, commodity pools, hedge funds, at least one pension fund, and other entities and persons. (Doc. 1, Count 1 ¶ 1).  Sentinel filed for bankruptcy on August 17, 2007.  Three days later, on August 20, 2007, the Securities and Exchange Commission ("SEC") filed a civil enforcement action against Sentinel (No. 07

1

C 4684). Shortly thereafter, on October 11, 2007, the Sentinel bankruptcy trustee filed

a complaint against Sentinel, Bloom, Mosley and others, alleging that these defendants:

> promised Sentinel customers that their money would [be] placed in safe,
> liquid and conservative investments; used customer property as collateral
> for credit Sentinel obtained in its own name; engaged in risky trading
> strategy inconsistent with what they told their customers; prepared and
> distributed false account statements; and failed to disclose those material
> facts to Sentinel's customers, resulting in customer losses of hundreds of
> millions of dollars.

(Doc. 44, at 2).

On January 28, 2008, Bloom's counsel in this case, Theodore T. Poulos and

Terence H. Campbell, filed appearances in the bankruptcy case, at which time they

received access to a password-protected document database created and maintained

by the bankruptcy trustee. That searchable database contains "a massive number of

Sentinel's business records, including records containing the information the defendant

currently seeks from the government." (*Id*. at 2-3).

On June 16, 2008, the SEC amended its complaint to add Bloom and Mosley as

defendants. The detailed 27-page indictment alleges "conduct similar to the conduct

alleged in the bankruptcy complaint." (*Id*. at 3). Attorneys Poulos and Campbell filed

appearances on Bloom's behalf in June 2008 and litigated against the SEC over the

next four years, including preparing briefs in opposition to summary judgment.[1] By the

time discovery was completed in January 2011, the parties had deposed 28 witnesses,

including three experts, and reviewed hundreds of thousands of documents from the

Bank of New York alone, and hundreds of thousands from Sentinel. (Case No. 07 C

4684, Doc. 194 ¶ 2). The SEC case was stayed after Bloom and Mosley were indicted

---

[1] The civil case filed by the SEC, as well as a separate civil enforcement action filed by
the Commodities Futures Trading Commission ("CFTC") on 4/28/2008, are pending before
Judge Kocoras.

on May 31, 2012 in this criminal case, charged once again with conduct similar to that alleged in the bankruptcy complaint. To date, the government has produced voluminous discovery, including *Jencks Act* information. All discovery was "on searchable compact disks that were accompanied by a hard copy index of the materials." (*Id*. at 4).

## DISCUSSION

A bill of particulars is necessary when "an indictment lacks sufficient detail to allow a defendant to prepare for trial, avoid prejudicial surprise, or protect himself against double jeopardy." *United States v. Linder*, No. 12 CR 22-1, 2012 WL 3264924, at *2 (N.D. Ill. Aug. 9, 2012). *See also United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) ("[T]he key question [in a bill-of-particulars analysis] is whether the defendant was sufficiently apprised of the charges against him in order to enable adequate trial preparation."). "An indictment that includes each of the elements of the charged crime, the time and place of the defendant's conduct which constitutes a violation, and a citation to the statute provides sufficient notice for the defendant to prepare for trial." *Id*. (citing *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003)). Even where such information is not found in the indictment, a bill of particulars is not required when "the information a defendant needs to prepare his defense is available through some other satisfactory form, such as discovery." *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003) (internal quotations omitted).

In determining whether to require a bill of particulars, a court should consider that "a defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." *United States v. Kendall*, 665 F.2d 126,

135 (7th Cir. 1981) (internal quotations omitted).  The decision whether to require a bill of particulars "rests within the sound discretion of the district court."  *Hernandez*, 330 F.3d at 975.

**False Statements**: Bloom first requests the government to provide the "details of each allegedly false or fraudulent statement it intends to prove at trial" including the dates of each statement and the identity of the persons to whom the statements allegedly were made.  (Doc. 38, at 3, 11).  Specifically, Bloom asks the government to provide the following particulars:

> The alleged false statements regarding "the risks associated with investing with Sentinel" including the dates of the statements and the identity of the persons to whom these allegedly false statements were made;
>
> The alleged false statements regarding "the use of customers' funds and securities" including the dates of the statements and the identity of the persons to whom these allegedly false statements were made;
>
> The alleged false statements regarding "the value of customers' investments" including the dates of the statements and the identity of the persons to whom these allegedly false statements were made; and
>
> The alleged false statement[s] regarding "the profitability of investing with Sentinel" including the dates of the statements and the identity of the persons to whom these allegedly false statements were made.

(*Id.* at 5).  Without this information, Bloom argues that he will need to comb through millions of documents and communications between Sentinel and its many customers over an almost five-year period "attempting to divine which of those statements gives rise to the charges against him."  (Doc. 46-1, at 3).

This Court agrees with the government that the indictment, together with the pretrial discovery already in Bloom's possession, provide sufficient information about the alleged false statements to allow for trial preparation, avoid prejudicial surprise, and

bar a second prosecution for the same offenses.  As for the indictment, it alleges in paragraph 3 that the defendants falsely represented "the risks associated with investing with Sentinel, the use of customers' funds and securities, the value of customers' investments, and the profitability of investing with Sentinel."  More detail is provided in other paragraphs of the indictment.  For example, paragraph 1(k) identifies specific misrepresentations in Sentinel's marketing material:

> The essence of Sentinel's service is preservation of capital and liquidity in even the most turbulent of market conditions. Sentinel has constructed a fail-safe system that virtually eliminates risk from short term investing;

> Sentinel buys only the highest quality and most liquid securities . . . . Sentinel's objective is to achieve the highest yield consistent with preservation of principal and daily liquidity, not simply 'the highest yield';

> Sentinel accounts are protected by something stronger than insurance: federal law . . . . Unlike FDIC insurance, which covers only the first $100,000 . . ., there is no financial limit on the protection offered by fiduciary law;

(Doc. 1 ¶ 1(k)).

According to the indictment, the first two statements above are false because the defendants "employed an undisclosed trading strategy for the House Portfolio that included extensive leverage, and a high concentration of illiquid and high-risk securities, that was inconsistent with the representations to customers."  (*Id.* ¶ 5).  In addition, the indictment alleges:

> The use of their customers' securities as collateral allowed the defendants to borrow more money than Sentinel otherwise could, subjected the customer securities to potential legal claims by creditors, and allowed the defendants to employ leverage to the extent that Sentinel itself, and all of the customer portfolios, were at increased risk of adverse market movements and insolvency.

(*Id.*). Ultimately, the government argues, "Sentinel's excessive use of leverage, created by the use of customer securities as collateral and by the purchase of risky, illiquid securities did in fact cause Sentinel to become insolvent causing massive customer losses." (Doc. 44, at 9).

The indictment further alleges that the defendants made false statements about the value of customer investments because they "on a daily basis caused false and misleading account statements to be created and distributed to customers. . . ." (Doc. 1, Count 1 ¶ 8). "These account statements reported returns earned by customers without disclosing that the returns actually had been allocated by the defendants, and were not the result of the market performance of the customers' particular portfolios." (*Id.*). The account statements were also false as to the value of the investments because they "did not disclose that the securities had been and were being used as collateral for Sentinel's loan from BoNY [the Bank of New York]" and because "many of them, particularly those issued in July and August 2007, contained incorrect securities and inflated values of certain securities listed on the statements." (*Id.*). As the government further explains in its response, the interest rate returns allegedly were "arbitrarily determined" by the defendants and others at their direction. (Doc. 44, at 10).

While the government is not required to identify the specific documents that it will offer at trial as evidence of the false statements, the response to the motion provides certain examples of such documents that already have been produced during discovery. One of these is a marketing document that defendant Bloom allegedly caused to be given to a Canadian investor less than two months before Sentinel went

bankrupt (Bates-numbered SEC_001-003107). This presentation stressed the safety and security of Sentinel investments, and made other alleged misrepresentations, including that customer funds were "held in segregated, bankruptcy proof accounts." (*Id.*).

Another example is an account-opening document in which Bloom allegedly "acknowledged that Sentinel was a 'discretionary investment advisor' for the customer, claimed that the customer's funds would be held in a custodial account for the benefit of the customer, and claimed that 'Sentinel shall not own nor have any interest in funds or securities in the account or of any other funds or securities in which Client has a beneficial interest.'" (*Id.* at 11). Bloom further affirmed in these documents that the customer's funds would be invested in Sentinel's "125 Portfolio"–the portfolio containing only the highest-rated securities. (Bates-numbered AUSA_Fortis00000033–37). According to the government, all of these statements were false in that the customer's funds were used as collateral for Sentinel's own loan, which went into default, and which caused the customer's assets to be encumbered by Sentinel's own creditor, as clearly alleged in the indictment. (*Id.*).

In a final example, the government points out that it produced a document known as a "seg letter," (Bates-numbered AUSA_Fortis00000435), in which Bloom acknowledged that the funds in two specific Sentinel accounts were required by federal law to be segregated for the benefit of commodity clients of the customer, yet the funds were used as collateral for Sentinel's own loan. The government contends that Bloom signed many such "seg letters" for Sentinel customers. (*Id.* at 12).

In his reply brief, Bloom expresses appreciation for the three examples of false statements but states that "to the extent the government intends to prove any other false statements, it should be ordered to identify them." (Doc. 46-1, at 3). What Bloom essentially is seeking to learn is the specific evidence that the government will offer at trial to prove the charges. It is well settled that a defendant does not have a constitutional right to know the details of how the government will prove its case. *Kendall*, 665 F.2d at 135 ("The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved."); *United States v. Cansler*, 419 F.2d 952, 954 (7th Cir. 1969) (The purpose of the bill [of particulars] is to adequately inform a defendant as to the indictment against him and is not to supply the defendant with a list of the government's witnesses."); *United States v. Glecier*, 923 F.2d 496, 500-02 (7th Cir. 1991) ("[T]he district court's refusal to order the government to [submit a bill of particulars] was not a clear abuse of discretion in light of the extensive pre-trial disclosure that did take place."); *United States v. Johnson*, 504 F.2d 622, 628 (7th Cir. 1974) (generalized showing of prejudice insufficient to justify a bill of particulars). Since Bloom has sufficient information to understand the nature of the false statement charges and prepare for trial, this Court recommends that the motion for a bill of particulars as to these charges be denied.[2] That said, given the complexity of the charges, the massive volume of discovery, and the almost five-year duration of the alleged scheme, the Court recommends that the government be required to provide defendants with a preliminary exhibit list (and periodic updates) long before trial.

---

[2] As discussed later in this Opinion, however, this Court is recommending that the government provide more particulars concerning the allegations of securities that were "incorrect" or had "inflated" values.

**Misappropriated Securities**: Bloom next focuses on the allegations in paragraphs 4 and 5 of Count 1 (incorporated in Counts 2-18) that he "misappropriated securities belonging to customer portfolios by using them as collateral for a loan that Sentinel obtained from BoNY to purchase millions of dollars worth of high-risk, illiquid CDOs from Firm 1 and Firm 2 for the benefit of Sentinel's House Portfolio." (Doc. 1, Count 1 ¶ 4; Counts 2-18 ¶ 1). Bloom asks the government to identify:

> the specific securities that Bloom allegedly misappropriated by using them as collateral for the BoNY loan and the date of each such misappropriation; and

> for each security identified in response to (a) above, identify each corresponding "high-risk illiquid CDO" purchased from Firm 1 and Firm 2 for the benefit of Sentinel's House Portfolio.

(Doc. 37, at 6).

Bloom notes that there is no dispute that Sentinel pledged hundreds of millions in securities to secure a daily overnight loan from BoNY but contends that "only a portion of the loan was used for the benefit of the House Account, while other portions of the loan were used for the benefit of the investor portfolios, in which case certain 'customer securities' could be properly pledged for loan." (Doc. 38, at 3). Bloom points out that Sentinel's internal records "allocated certain portions of the loan to the various portfolios and a certain portion of the loan to the House Account." (Doc. 41-1, at 6). "Thus, the mere fact that some portfolio assets were pledged as security for the loan does not demonstrate that the investor portfolio assets were pledged as security for the *House's portion* of the loan." (*Id.*) (emphasis in original). Bloom observes that "[n]either the SEC nor the CFTC could ever point to any specific 'customer security' that was improperly pledged, and the indictment suffers the same defect." (*Id.*). Bloom therefore asks the government to identify which securities were "pledged improperly for the benefit of

Sentinel's House Account. … as opposed to being properly pledged for the benefit of the those [sic] customers." (Doc. 46-1, at 8-9).

The government states that the specific securities allocated to the House account are listed in Sentinel's "Active and Matured" report and in other Sentinel business records and are available in the bankruptcy trustee's document database. (Doc. 44, at 12-13).[3] Bloom says this report merely shows Sentinel's "entire securities holdings and identifies the portfolio in which each security was designated," but provides "no information whatsoever as to which securities were pledged as collateral on a daily basis." (Doc. 46-1, at 8).

To the extent that Bloom seeks to know what the Sentinel and BoNY documents illustrate concerning which securities were pledged on a daily basis and how, this information is already available to him. Bloom also is aware of what the testimony will be of certain BoNY and Sentinel witnesses on this topic. Indeed, Bloom relied on all of this evidence in successfully opposing summary judgment on this issue in the SEC lawsuit. In denying summary judgment, the district judge stated: "[T]here is a genuine issue of material fact as to whether Sentinel improperly pledged client securities to collateralize the BoNY loan for the benefit of the House Portfolio." *SEC v. Sentinel*, 2012 WL 1079961, at *7 (N.D. Ill. Mar. 30, 2012).[4] Bloom's extensive analysis of the evidence and defense of the allegations in the SEC lawsuit (see Doc. 250, at 14-18) persuades the Court that Bloom has sufficient information to understand the nature of

---

[3] The government also argues that Bloom already knows which securities were pledged as collateral for the Bank of New York loan. (Doc. 44, at 12). Bloom denies this. (Doc.46-1, at 8). Even assuming the defendant's pre-existing knowledge may properly be considered by the Court (the government cites no authority for this), this Court declines to do so here in light of the factual dispute that exists.

[4] Bloom suggested that the Court review this particular opinion as background when considering the motion for a bill of particulars. (Doc. 38, at 2).

the misappropriation charges and defend himself.  What he really is seeking to know is how the government will overcome his theory of defense as articulated in the SEC litigation.

As for the information about the CDOs, Bloom argues that "[e]very security Sentinel purchased was consistent with the stated investment portfolio guidelines at the time of its purchase" and the indictment "fails to specify a single security out of the billions in securities Sentinel purchased that was in any way contrary to stated investment guidelines." (Doc. 38, at 3).  The government responds that the defendant's own records show what CDOs Sentinel bought from Firm 1 and Firm 2, as do the pleadings in certain civil lawsuits involving those firms in which Bloom was also a party.[5] (Doc. 44, at 13).  Again, the Court finds that the indictment and discovery -- not to mention information obtained through related civil lawsuits -- provide sufficient notice of the facts and charges to allow Bloom to prepare a defense and he already has articulated one.  The Court therefore recommends that the motion for a bill of particulars as to these charges be denied.

**Misleading Account Statements**: Bloom lastly complains that the indictment contains "bald assertions" that the defendants "falsely represented the interest earned by Sentinel's portfolios, the value of particular securities in those portfolios and the risk associated with investing in them." (Doc. 38, at 3).  Bloom observes that the indictment "fails to identify a single false interest rate, let alone specify how or why any stated interest rate was false." (*Id.* at 3-4).  Similarly, Bloom contends that the indictment fails

---

[5] According to the government, the bankruptcy trustee filed civil lawsuits against Firm 1 (08CV6587) and Firm 2 (09CV193).  Both firms then filed third party complaints against Bloom.

to identify a "single security with a falsely stated value, let alone allege the purported true value of any such security." (*Id.*). He requests the following particulars:

> the account statements referenced in ¶¶ 3 and 8 of Count 1 and ¶ 2 of Count 20;
>
> the "incorrect securities" by each daily account statement;
>
> the securities listed with "inflated values" and the nature and extent of the "inflated values" by each daily account statement; and
>
> each security on the August 13, 2007 customer statement referenced in ¶ 2 of Count 20 that was listed with false market values and the nature and extent of the "false market values".

(Doc. 37, at 6).

The government argues that Bloom is not entitled to this "wish list" and already has access to the information that he seeks from attending depositions of former employees and from telephone recordings that were produced to him. (Doc. 44, at 13-14). This evidence, the government contends, reveals that "**all** of the statements for the time period identified in the indictment are false." (*Id.*) (emphasis in original). The government further responds that "in the last weeks of Sentinel's operation the defendants allocated to Sentinel's SEG 3 customers illiquid CDOs that neither Sentinels' repo counterparties nor the Bank of New York would accept as collateral due to their low quality." (*Id.*). Three specific daily account statements that illustrate this are identified in the government's response. The government objects to providing more information (likening Bloom's request to civil interrogatories) and aptly notes that counsel for Bloom have been investigating and litigating the issues arising from Sentinel's collapse for nearly five years so any claim that they must resort to "guesswork" to defend the charges "rings hollow." (Doc. 44, at 15).

This Court agrees with the government with one exception. Paragraph 8 of Count 1 of the indictment states: "The daily account statements were also misleading in that many of them, particularly those issued in July and August 2007, contained incorrect securities and inflated values of certain securities listed on the statements." (Doc. 1). As it stands now, the government appears focused on the account statements in the last weeks of Sentinel's operation but the indictment leaves open the possibility that Bloom will be confronted with account statements from years earlier. If the government is intending to offer evidence of misleading daily account statements *prior* to July 2007, this Court recommends that it be required to identify these account statements that allegedly reflect incorrect securities and securities with inflated values by time period or in some other fashion.

Further, as to all such account statements (whether before or after July 2007), the Court recommends that the government be required to identify the specific securities that allegedly were "incorrect" or inflated in value on the account statements. In its response to the motion the government suggests that the securities were incorrect and inflated because they were "low-quality" or "illiquid" rather than "investment grade." (Doc. 44, at 14-15). Since these terms are somewhat ambiguous, and neither the SEC nor the CFTC alleged that Sentinel purchased securities that were below "investment grade", Bloom requires more particulars, namely, the identity of the securities that the government believes to be incorrect or inflated in value—in order to prepare a defense.

For the reasons stated above, this Court recommends that Bloom's motion for a bill of particulars be granted in part and denied in part. Further, the Court recommends that the government be required to provide a preliminary exhibit list (and periodic

updates) to the defendants long before trial. Pursuant to Fed. R. Civ. P. 72(b), specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served. Failure to file objections with the Honorable Ronald A. Guzman within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation.


Dated:  January 2, 2013

_____
SHEILA FINNEGAN
United States Magistrate Judge