2820

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4              Plaintiff,            )
                                      )
 5     v.                             )  No. 12 CR 409
                                      )
 6   ERIC A. BLOOM,                   )  Chicago, Illinois
                                      )  March 25, 2014
 7              Defendant.            )  9:00 a.m.

 8                          VOLUME 18
                  EXCERPT OF TRIAL PROCEEDINGS
 9        BEFORE THE HONORABLE RONALD A. GUZMAN AND A JURY
     APPEARANCES:
10
     For the Plaintiff:          HON. ZACHARY T. FARDON
11                               United States Attorney
                                 BY:  MR. CLIFFORD CHARLES HISTED
12                                    MR. PATRICK MARK OTLEWSKI
                                 Assistant United States Attorneys
13                               219 South Dearborn Street
                                 Suite 500
14                               Chicago, Illinois  60604
                                 (312) 353-5300
15
     For the Defendant:          COTSIRILOS, TIGHE, STREICKER,
16                               POULOS & CAMPBELL, LTD.
                                 BY:  MR. THEODORE THOMAS POULOS
17                                    MR. TERENCE H. CAMPBELL
                                 33 North Dearborn Street
18                               Suite 600
                                 Chicago, Illinois  60602
19                               (312) 263-0345

20                               RYAN & SWYGERT, LLC
                                 BY:  MR. MATTHEW S. RYAN
21                               33 North Dearborn Street
                                 Suite 600
22                               Chicago, Illinois 60602
                                 (312) 332-5675
23
     Court Reporter:             Nancy C. LaBella, CSR, RMR, CRR
24                               Official Court Reporter
                                 219 S. Dearborn Street, Room 1222
25                               Chicago, Illinois  60604
                                 (312) 435-6890
```

2821

```
 1        (The following is an excerpt of report of proceedings:)

 2              THE CLERK:  12 CR 409, United States of America v.

 3    Bloom.

 4              MR. HISTED:  Good morning, your Honor.  Cliff Histed

 5    and Patrick Otlewski for the government.

 6              MR. POULOS:  Good morning, your Honor.

 7              THE COURT:  Good morning.

 8              How long do you think you'll be?

 9              MR. HISTED:  I'm hoping not to exceed an hour, Judge,

10    probably less.

11              THE COURT:  Okay.

12              The exhibits, are we all squared?

13              MR. POULOS:  I think we're all squared away.

14              MR. OTLEWSKI:  Yes, your Honor.

15              THE COURT:  Okay.  And the last thing is the

16    transcripts.

17              MR. POULOS:  Your Honor, we object to the transcripts

18    going back --

19              THE COURT:  Okay.

20              MR. POULOS:  -- at this time.  The instruction has

21    been prepared.  If they want them, obviously they'll get them.

22              THE COURT:  All right.  Then we'll be out at 9:30,

23    bring the jury out, commence the final closing.

24              MR. HISTED:  Thank you, Judge.

25              THE COURT:  Thank you.
```

Histed - Rebuttal Argument

2822

1     (Recess taken.)

2          THE COURT:  Will you be using the prompter?

3          MR. HISTED:  I'll be using the document camera here,

4     your Honor, the Elmo.

5          THE COURT:  I think that's where we're at.

6          Ready for the jury?

7          MR. HISTED:  Yes.

8          MR. POULOS:  Yes.

9          THE COURT:  Let's bring them out.

10    (Jury in.)

11         THE COURT:  Good morning, ladies and gentlemen.

12    Welcome back.

13         The Court recognizes the government for its closing

14    rebuttal.

15         MR. HISTED:  Thank you, Judge.

16         REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

17    BY MR. HISTED:

18         Ladies and gentlemen, make no mistake, the way that

19    man ran Sentinel Management Group during the last few years of

20    its existence was an outrageous scam.  This defendant betrayed

21    and lied to his customers, and he lied about protecting the

22    money that they had entrusted in his care.  He lied on the

23    Sentinel Web site.  He lied in the investment management

24    agreement.  He lied in the so-called segregation letters.  He

25    lied on a daily basis in the daily account statements that

Histed - Rebuttal Argument

2823

 1    were sent to the customers.  And, yes, folks, he lied directly

 2    to their face when he met some of these customers in person.

 3            This is not a case about mismanagement.  This is not

 4    a case about hindsight scrutiny of business decisions made

 5    under tough circumstances.  This is a case about the

 6    defendant's long-running scam and his scheme to defraud his

 7    customers, a scam that started years before the financial

 8    crisis.

 9            Let me just be blunt.  That man ripped off his

10    customers.  And we have absolutely proven that beyond a

11    reasonable doubt in this case.

12            Before I go any further discussing some of the

13    evidence with you, I want to share with you some of the jury

14    instructions that we anticipate Judge Guzman will give to you.

15    Yesterday some of the -- some of the instructions were shown

16    to you by defense counsel, but I'm going to show you some

17    right now to sort of frame the way we should be thinking about

18    the evidence that we see in this case.

19            Ladies and gentlemen, you've heard a lot about good

20    faith yesterday.  And you were shown portions of the good

21    faith jury instruction that we anticipate you'll get.  I

22    believe Mr. Campbell read the first and second paragraphs to

23    you yesterday.

24            I want to call your attention to the third paragraph,

25    which says, A defendant's honest and genuine belief that he

Histed - Rebuttal Argument

2824

 1    will be able to perform what he promised is not a defense to

 2    fraud if the defendant also knowingly made false and

 3    fraudulent representations.

 4         Do you understand, there can be no good faith defense

 5    for a defendant who knowingly lies.  Those two are

 6    incompatible ideas.  And I'm going to talk to you about some

 7    of the defendant's lies as we go on a little bit later this

 8    morning.

 9         It's important also for your consideration that in

10    considering whether the defendant has proven a scheme to

11    defraud -- and that, folks, is what we have alleged here --

12    the government must prove that one or more of the false

13    pretenses, representations or promises or omissions or

14    concealment of material facts charged in the indictment, we

15    must prove them beyond a reasonable doubt.  But the government

16    is not required to prove them all.  This is an important

17    point.

18         Give the weight -- give the evidence whatever weight

19    you think it deserves, but use your common sense.  I'm going

20    to be calling on you to use your common sense.  You should use

21    your common sense.  And you should bring to bear your everyday

22    experience when considering the evidence.

23         People sometimes look at one fact and conclude from

24    it that another fact exists.  This is called an inference.

25    You are allowed to make reasonable inferences so long as they

Histed - Rebuttal Argument

2825

1    are based on the evidence.  And I raise that point because

2    yesterday I think Mr. Campbell might have left you with the

3    misimpression about the things that the government does and

4    does not have to prove in this case.

5         You may recall comments such as, if there's a tiny

6    little hole somewhere over here, the government has utterly

7    failed to prove its case.  That is wrong.  That is misleading.

8    We must prove one of the false representations in this case.

9    We need not prove them all.  And you are allowed to make

10   reasonable inferences.  You are allowed to look at the

11   evidence in the context of your own day-to-day life and make

12   reasonable inferences from that evidence.

13        I will read this one for you:  An offense may be

14   committed by more than one person.  A defendant's guilt may be

15   established without proof that the defendant personally

16   performed every act constituting the crime.

17        Keep that in mind when we talk about who gave

18   directions to whom.  Yesterday you may have been left with the

19   misimpression that if the defendant did not personally do

20   every single act that constitutes a crime, he can't be guilty.

21   That is not true.  It is not required that the defendant

22   personally sat down and typed in false account rates on the

23   account statements.  Though, certainly he did.  It is not

24   required that he personally do every single thing if he

25   directs others to act on his behalf.

1          Any person who knowingly aids, counsels, commands,

2   induces or procures the commission of an offense may be found

3   guilty of that offense if he knowingly participated in the

4   criminal activity and tried to make it succeed.

5          In other words, if you induce others to commit a

6   crime and you do so knowingly, you can be convicted of that

7   crime.

8          If the defendant knowingly causes the acts of

9   another, as I said, the defendant is responsible for those

10  acts as though he personally committed them.  But the

11  instruction goes on to say that, of course, you can't be found

12  guilty if you have no knowledge of the crime.

13         Just a few more of these, folks.  They'll be

14  important as we go forward.

15         A person acts with the intent to defraud when he acts

16  with the intent to deceive or cheat another person in order to

17  cause a gain of money or property to the defendant or another

18  or to cause the potential loss of money or property to another

19  or to expose another person to a substantial risk of loss of

20  which that other person is not aware.

21         And, finally, I'll direct your attention simply to

22  the highlighted portions.  Investment advisers owe fiduciary

23  duties to their customers.  These duties include an

24  affirmative duty of utmost good faith and full and fair

25  disclosure of material facts, although simply failing to carry

1    out your duty does not in and of itself constitute a criminal

2    offense.

3          All right.  Now that we've got some of these bedrock

4    principles, I want to point out to you that every time you

5    heard the word "good faith" yesterday -- that's good faith;

6    that's good faith.  Over and over you heard that -- that drum

7    beat upon.  It was not made clear to you that that is not

8    available to somebody who lies.  And in this case, that's what

9    happened.

10          Yesterday you were shown portions probably for the

11    first time of the indictment.  I want to call your attention

12    to two paragraphs of this indictment because they'll be very

13    important to your consideration.

14          Paragraph four says, It was further part of the

15    scheme that the defendants Bloom and Mosley misappropriated

16    securities belonging to customer portfolios by using them as

17    collateral for a loan that Sentinel obtained from the Bank of

18    New York to purchase millions of dollars worth of high-risk,

19    illiquid CDOs from Firm 1 and Firm 2 for the benefit of

20    Sentinel's House Portfolio -- for the benefit of Sentinel's

21    House Portfolio -- without disclosing to Sentinel customers

22    that the securities were being used in this manner.

23          Then later on, down in paragraph five, The defendants

24    employed an undisclosed trading strategy for the House

25    Portfolio that included extensive leverage and a high

```
 1   concentration of illiquid and high-risk securities that was

 2   inconsistent with the representations made to customers.

 3           Why have I pointed that out to you?  All throughout

 4   this trial, including yesterday afternoon, you heard

 5   constantly this argument made, There is no evidence whatsoever

 6   that Sentinel bought inappropriate securities for customer

 7   portfolios.

 8           Folks, we never took that on.  That has never been a

 9   part of the case.  Every minute of time we spent on

10   cross-examining witnesses about that issue, about whether

11   securities were suitable for customer portfolios, every minute

12   of time we heard arguing that point was a complete and utter

13   waste of your time and it misdirected your attention and your

14   energy.  It is one of the many ways that the defendant has put

15   up a smoke screen in this case, hoping that you would get

16   lost.

17           MR. POULOS:  Your Honor, I object to that.  It's an

18   improper attack on defense counsel.

19           THE COURT:  No, it's not an attack on defense

20   counsel.  It's an attack on defense strategy, which is

21   allowed.  Overruled.

22           MR. HISTED:  Thank you, Judge.

23           THE COURT:  And let me assure the jury that you

24   should not take anything said by the attorneys as an attack on

25   each other.  That is not allowed.
```

Histed - Rebuttal Argument

2829

1        MR. HISTED:  Thank you, Judge.

2    BY MR. HISTED:

3        Let's talk about some of the defendant's lies, the

4    lies that completely gut his so-called good faith defense.

5    The defendant did not act in good faith, and we ask that you

6    give no weight and no credit to those assertions.

7        First of all, he lied on the Web site.  Do you

8    remember the part of the Web site where it says, How can we

9    deliver investment gains without taking excessive risk?  And

10   then there were four different points, bullet points, beneath

11   that where the defendant purported to tell people how they

12   could generate that investment return without risk -- without

13   excessive risk.

14       What is not found on that Web site is the discussion

15   of leverage.  Leverage is the way that they delivered the

16   investment returns, not the other four ways.

17       Now, we're not here to say that they were required to

18   disclose the use of leverage on the Web site itself.  But

19   where you tell somebody a half-truth, pretending to tell them

20   the entire truth, that is a lie.  The defendant could have

21   remained silent on the Web site about leverage, but instead he

22   chose to take on the issue.  He answered the question that

23   people wanted to know:  How can you deliver these investment

24   returns without taking excessive risk?  And by not saying

25   leverage, which was the truth, when posing that question, he

Histed - Rebuttal Argument

2830

1   was telling a half-truth.  And a half-truth that masquerades

2   as the full truth is a lie.

3          And I think that's a matter of common sense.  Right?

4   If you want to know something from somebody and you ask them

5   to tell you the full truth and they tell you only half of the

6   truth, knowing that you need the truth, I think we all know

7   that we feel as though we've been deceived.  And that's

8   certainly the case that happened here.

9          And while I'm on the subject of telling the truth,

10  just remember -- taking you back to that jury instruction that

11  I just showed you -- the defendant was an investment adviser.

12  Right?  That's a role he took upon himself.  He chose to

13  become an investment adviser to take advantage of the status

14  and the business opportunities that come along with that.  So

15  he decided to register with the Securities and Exchange

16  Commission.  And when he took on the role and the

17  responsibility and the benefit of becoming an investment

18  adviser, he took on this fiduciary duty.

19         And fiduciaries like the defendant, as you saw from

20  the jury instruction, have an utmost duty of good faith, an

21  affirmative duty to give full and fair disclosure.  Right?

22  Fiduciaries are not allowed to hide behind fine print is the

23  point I'm trying to make.  Fiduciaries like the defendant are

24  supposed to go out of their way to tell the truth to people

25  when those people entrust their money to them in their role as

Histed - Rebuttal Argument

1    a fiduciary.

2              So with that idea, let's go back to the Web site.

3    Also on the Web site, we saw documents called portfolio

4    attributes.  You've seen these documents many times in this

5    case.

6              This portfolio attributes document happens to be

7    dated June 30th, 2007, but you saw many iterations of this

8    throughout the trial.  You've seen some from 2005, 2006 that

9    the defendant e-mailed to some of his customers.  This

10   document, folks, is another lie.  It is an affirmative lie

11   because by now you've heard the evidence that they manipulated

12   the interest rates, Mr. Bloom and Mr. Mosley, that they

13   reported on a daily basis to their customers.  That has been

14   clearly established.  And I'm going to talk more about that

15   later.

16             But you heard Jeff Logan testify that the same data,

17   the same information that was used to create those phony and

18   false -- those fake account statements was then imported into

19   documents like this.  So anybody who went to the Sentinel Web

20   site and looked at these graphs would be falsely led to

21   believe that Sentinel's 125 Portfolio had outperformed the

22   competition.  You didn't have to be a customer to be exposed

23   to this falsehood.  Anybody who went to the Web site would see

24   it.  And then, additionally, when they e-mailed these to the

25   customers, that was just one of the many sorts of lies that

Histed - Rebuttal Argument

2832

1    I'm talking about here.

2             The defendant lied on the investment agreements

3    themselves.  I'm not going to pull out one.  You've seen

4    dozens and dozens of those.  But you've by now become familiar

5    with this language.  Sentinel shall not own nor have any

6    interest in funds or securities in the account or of any other

7    funds or securities in which the client has a beneficial

8    interest.  In this important pledge that was made to every

9    single customer, on every single investment agreement going

10   back at least to the '90s and probably before, this false

11   statement was made.  And it is false because, as we know, the

12   defendant pledged his customers' securities as collateral for

13   a loan that the House Portfolio, that his portfolio, used for

14   his benefit.  And when you pledge your customers' securities

15   as collateral for your own benefit, you cannot say to them,

16   Sentinel shall not own or have any interest in your funds or

17   in your securities.  That's just one of the lies that thread

18   sort of throughout this entire case.

19            He lied on the Form ADV.  Do you remember that Form

20   ADV?  We've seen multiple, multiple iterations of that.  You

21   may remember this familiar language, The registrant may use

22   repurchase/reverse repurchase agreements and/or bank loans as

23   part of its investment strategy or for liquidity purposes.

24            No.  No.  Sentinel may not use it.  Sentinel was

25   using leverage.  And this is one of those half-truths that I

Histed - Rebuttal Argument

2833

 1   was telling you about before.  When you pretend to disclose

 2   facts to somebody and you disclose only half of the truth or

 3   suggest the possibility of a truth, you are lying.  The Form

 4   ADV that you saw over and over was a half-truth designed to

 5   mislead.  There is nothing in that form that tells customers

 6   in the 125 Portfolio, hey, folks, we are using leverage; we

 7   are.  It doesn't say how much or how often or in what manner.

 8   And that's what the people wanted to know.  That was business

 9   critical information for the customers of Sentinel; are you

10   using leverage and, if so, how.

11        The financial statements.  Time and time again, your

12   attention has been directed to these audited financial

13   statements that Sentinel put out; and they held them up as

14   examples of disclosure of leverage.  Folks, you can scour

15   these audited financial statements to your heart's content and

16   you're never going to see any disclosure to a customer in the

17   125 Portfolio that their securities are being used as

18   collateral for the loan.  You're never going to see a

19   disclosure that their money is put at risk.  You're never

20   going to see a disclosure that talks about the 125 Portfolio.

21        And not all customers saw that.  Right?  Some of the

22   customers routinely requested the financial statements and

23   they got them and they looked at them and were still confused.

24   And I'll talk about that in a minute.  Others never got them

25   at all.  You can't hold out a document as a disclosure that

Histed - Rebuttal Argument

2834

1    you've made to your customers if you don't give it to the

2    customers.  The response might be, well, some customers asked

3    for them and others didn't.  But just -- you can't just not

4    give a document as a disclosure to a customer and then later

5    say it was available there if they had asked for it.

6           Another lie that the defendant told was in these

7    so-called segregation letters.  You've seen several copies of

8    these, several different versions.

9           This is Government Exhibit 706.  This is a letter

10   that the defendant signed in the fall of 2006 for a customer

11   called Fortis.  And in this letter, the defendant said, I

12   acknowledge that the funds -- customer, Fortis -- that you are

13   giving me are segregated futures customers' funds.  And I

14   promise to treat these funds separately, to treat them in

15   accordance with the CFTC rules and regulations of the

16   Commodity Exchange Act.  And then the defendant signed that.

17   Again, it's dated up at the top August 2006.  But I believe it

18   was actually effectuated in September, according to the fax

19   heading.

20          Why is -- why does this matter?  Why do we care about

21   the seg letter?  Do you remember what else was happening in

22   the fall of 2006?  During the time that the defendant signs

23   this letter and says to Fortis, I will keep your money

24   separate, I understand what the rules are, I understand what

25   the regulations are, the defendant was, in fact, already using

Histed - Rebuttal Argument

2835

1    customer funds as collateral for his own trading loan.  He

2    just was.

3              Let me show you Government Exhibit 603.  You saw this

4    during the trial.  This is around the same time period that

5    the chief financial officer, T.C. Arana, was discussing this

6    issue with the defendant.  This e-mail is dated October 19th,

7    2006.  And in the e-mail, T.C. says, Specifically to reiterate

8    that we do not want to be using customer assets to secure the

9    house loan and that perhaps hypothecating -- or pledging --

10   customer SEG 1 securities for the loan may not be something

11   that we want to be doing.

12             Okay.  This was happening at Sentinel at the same

13   time the defendant signed that segregation letter promising to

14   keep those funds safe.

15             What else was happening?  You saw the analysis done

16   by the litigation consultant from Mesirow Financial.  Sentinel

17   had, as you know, an enormous loan from the Bank of New York.

18   And according to this chart, Government Exhibit 1505, you can

19   see that the house portion of the loan, the portion of the

20   loan that Sentinel itself allocated to its own personal

21   trading, was gigantic.  Folks, look at this.  In January

22   of 2006, that loan was more than $100 million.  $100 million

23   that the defendant was using of its business loan secured at

24   all times by the customer securities.

25             MR. CAMPBELL:  Objection, Judge.  That's false.  That

Histed - Rebuttal Argument

2836

1    is just false.

2            THE COURT:  The objection will be overruled.  And I

3    will reiterate to the jury that they are to rely upon their

4    own recollection of what the evidence was.

5    BY MR. HISTED:

6            Starting out at more than $100 million, going up,

7    continuing on.  You've seen the chart before.  You'll have a

8    chance to examine this in the back.

9            There was a portion of the Bank of New York loan

10   allocated to the house.  The defendant's own documents, the

11   daily yield allocation sheet, showed that over and over and

12   over again.  I show you this document just to point out -- and

13   this covers the time period that I was just talking about in

14   the segregation letter.  At the time the defendant signed this

15   pledge, this promise to Fortis, an FC- -- an FCM, he knew at

16   that time that he already was using funds belonging to

17   customers like that for his own loan.

18           Putting aside these documents that I've shared with

19   you, the defendant also looked some of these customers dead in

20   the eye and lied right to their face.

21           Do you remember Rotchford Barker?  He was the

22   gentleman from Wyoming, the rancher who came out here.  He met

23   face-to-face with the defendant, looked him dead in the eye

24   and told him, I want the most conservative investments you

25   have, Mr. Bloom.  I don't want any bonds that have a duration

1    longer than 90 days.  Can you help me?  And the defendant

2    said, yes, we can do that.  I will put you in a portfolio

3    where that is the -- where those are the parameters.  And we

4    know that's not what happened.

5          You saw the account statement dated August 13th,

6    2007, for Mr. Barker.  First of all, the bonds shown on that

7    statement didn't have a duration of 90 days or 90 weeks or

8    90 months.  They went out for years.  They were these PreTSLs,

9    CDOs, and other sorts of CDOs.  And you also saw from the

10   August 13th, 2007, account statement that 14 of the 16

11   securities on Mr. Barker's statement were pledged as

12   collateral for the loan.  That is not what Mr. Barker

13   bargained for.  And the defendant looked him in dead in the

14   face and told him he would give him the most conservative

15   investment possible.  And we know that Mr. Barker didn't just

16   misremember that when he was testifying.  He had a very clear

17   memory of it.  And there is independent, contemporaneous,

18   objective documentation that that's the case.

19         You may recall Government Exhibit 1203, which is an

20   e-mail from the defendant to Mr. Barker where the defendant

21   says on the second page, Rotchy, you had said you would like

22   to stay inside 90 days, so I looked into municipal money funds

23   and other short-term investments.

24         Mr. Barker knew exactly what he needed.  This is

25   documentation that he got what he bargained for or at least

Histed - Rebuttal Argument

2838

 1    that he was clear on what the defendant had promised him,

 2    although the defendant did not deliver on that.

 3              MR. CAMPBELL:  Judge, I have to object.  That

 4    entirely misstates that document.  That document says here's

 5    what you would get if --

 6              THE COURT:  No, no.

 7              MR. CAMPBELL:  -- you --

 8              THE COURT:  No, just make an objection.  The

 9    objection --

10              MR. CAMPBELL:  Misstates the evidence.

11              THE COURT:  The objection is overruled.  Again I

12    instruct the jury that they are to rely upon their own

13    recollection of what the evidence actually was and is and not

14    on what the attorneys may say.

15              Proceed.

16              MR. HISTED:  Thank you, Judge.

17    BY MR. HISTED:

18              Speaking of lying directly to victims' faces, do you

19    remember Mike Maher?  Mr. Maher was the chief financial

20    officer of a company called Kottke Associates, which at the

21    time was an FCM.  Mr. Maher was one of the last witnesses who

22    we called in our case.  Do you remember he told you that he

23    and his accountants drove out to see the defendant in December

24    of 2005 at Sentinel's office.  Mr. Maher was the CFO of the

25    company; and it was the year-end, and he had his own

Histed - Rebuttal Argument

2839

1    accountants with him.  And he wanted to make sure that their

2    own -- Kottke's own audited financial statements were in

3    order.  And a lot of Kottke's money was held at Sentinel, so

4    the accountants wanted to kick the tires.  They wanted to go

5    see what Sentinel was all about.

6          They drove out to see the defendant in December

7    of 2005 and sat down with him.  And Mr. Maher and the

8    accountants had a copy of the financial statements with them,

9    and they asked the defendant questions.  They said, Tell me

10   how you keep our funds segregated.  Tell me how you manage our

11   cash.  Tell me about this Bank of New York loan.  And keeping

12   in mind that in December of 2005, the defendant was already

13   setting interest rates.  And I'm going to pause here to show

14   you some documentation as to that.

15         This is Government Exhibit 165.  This is an e-mail

16   you've seen before where Charles Mosley, in October of 2005,

17   two months before Mr. Maher goes to see him, Mr. Mosley says,

18   We raised the rates in Group 7 -- you'll recall that Group 7

19   is the 125 Portfolio.  That's the portfolio where FCMs like

20   Kottke were.  We raised the rates in Group 7 by five basis

21   points; however, we could only raise the SMG loan fee to .02.

22   Then he goes on to talk about the rates and setting the rates.

23   And the defendant responds back, Agreed.  Okay.

24         Just simply establishing that by October of 2005, two

25   months before the meeting with Mr. Maher, the defendant knows

Histed - Rebuttal Argument

2840

1    he's already allocating the interest rates.  In fact, you

2    heard testimony from Crystal York that going back as far as

3    when she joined the company, 2003, they had been setting these

4    interest rates.

5         So as Mr. Maher and his accountants sat down in the

6    Sentinel office with the defendant, the defendant said, Your

7    funds are segregated.  We keep your funds segregated.  We know

8    that you're an FCM.  And they said, Well, tell us about repos.

9    And the defendant said, We manage cash by sending out our

10   excess cash and accepting securities as collateral for that;

11   and then the next day, we return those securities and we get

12   the cash back plus interest.  And that was allowed.  That's

13   allowed under Rule 1.25, that sort of cash management

14   technique.  That's what the defendant said to Mr. Maher he was

15   doing with his money.

16        The defendant did not say, Let me tell you what we

17   do.  We repo out your securities, we get cash, then we use

18   that cash to buy more securities and create leverage in the

19   portfolio.  That was what was happening, but that's not what

20   he told Mr. Maher when he was looked directly in the face and

21   asked to account for how he uses the money.  Mr. Maher said --

22        MR. POULOS:  Your Honor, I -- Judge, there is no

23   evidence that SEG 1 was using any form of leverage at that

24   time.

25        THE COURT:  Just make an objection.  Don't make an

 1    argument.

 2         MR. POULOS:  Judge, I --

 3         THE COURT:  Just make an objection as to the

 4    statement.

 5         Your objection is noted.  It is overruled.  I have

 6    already instructed the jury that if anything the attorneys say

 7    contradicts or conflicts with what they recall the evidence

 8    is, they are to rely on their own collective recollection and

 9    ignore what the attorneys say.

10    BY MR. HISTED:

11         Your Honor, I'd like to call our attention here to

12    Government Exhibit 301.

13         This is an e-mail dated October 2005 from Crystal

14    York to Eric Bloom.  And in the subject line she says, Here

15    are the rates for today.  And then there's an attachment.  The

16    second page of this document is one of these daily yield

17    allocation sheets that we've become very familiar with.  And

18    if you look at the daily yield allocation sheet, you can see

19    down here at the bottom, that, in fact, some of the loan was

20    allocated to SEG 1, as I said.

21         Taking us back to the meeting with Mr. Maher.

22    Mr. Maher asked about the Bank of New York loan and what use

23    it was put to.  According to the financial statements, that

24    loan was used for liquidity purposes, meaning it was used to

25    make short-term redemptions to customers who needed their

Histed - Rebuttal Argument

2842

1    money right away and securities could be liquidated later and

2    used to pay down the loan.  In other words, the loan was used

3    as a short-term financing mechanism.  That's what the

4    financial statements said.  But what we know is that the Bank

5    of New York loan was used for leverage.  Right?  That's been

6    fairly well threshed out in this case.  And the loan was very

7    large and was getting very much larger.  The defendant did not

8    tell Mr. Maher, Mike, we're using this for leverage.  He said

9    we're using it for liquidity purposes only.

10          And you may recall that I asked Mr. Maher, what would

11   you think if the defendant told you we're repo'ing out

12   securities and getting cash.  Just stopping right there, not

13   even using the cash to buy more securities.  Let's -- just

14   stopping right there.  And Mr. Maher said, I would not even

15   understand why they would do that.  Because repo'ing out my

16   securities and then getting cash back would mean that they'd

17   have to pay interest on that the next day, and that doesn't

18   make any kind of sense, given my understanding about what

19   Sentinel was doing.  Mr. Maher thought stopping there, without

20   the creation of additional leverage, was something that he was

21   not comfortable with or didn't understand, let alone what the

22   defendant was actually doing.

23          The point here is that when given the opportunity to

24   come clean with a customer who came to him, who visited him,

25   who had the financial statements in hand, who had his

Histed - Rebuttal Argument

2843

1   accountants with him, the defendant lied to this person.

2   People who lie cannot avail themselves of a good faith

3   defense.

4          If the defendant had told the truth to Mr. Maher,

5   this is what the conversation perhaps might have sounded like:

6   Mike, just so you know, we're using leverage.  We're taking

7   your securities, we're pledging them as collateral for a loan.

8   Is that all right with you?  Maher would have bolted for the

9   door.  That was not what he bargained for with his customer

10  segregated securities.  If he said, you know what, we're

11  allocating the interest rate.  Mike, you know that account

12  statement you get every day from us, we just decide how much

13  interest we're going to pay you; and we take some of that

14  interest from other customers, we take some of that interest

15  from our House Portfolio and we allocate it to you in the way

16  we see fit; and the interest may come from securities that

17  don't comply with Rule 1.25.  Mike, is that okay with you?

18  Maher would have bolted for the door.  And the defendant knew

19  that, and that's why he lied to him.

20         If the use of leverage at Sentinel was so well

21  disclosed, as the defendant would have you all believe, why is

22  it that the customers didn't know?  Right?  Why didn't they

23  know?  How can you run a business using leverage and none of

24  your customers know about something that you say is disclosed

25  to everyone?  Folks, use your common sense and your everyday

Histed - Rebuttal Argument

2844

1    experiences.  That makes no sense.

2           And when he says that leverage was fully disclosed to

3    everybody, when the defense theory is that leverage was fully

4    disclosed to everybody, how come Steve Stitle, their sales

5    manager, did not know?  How can Sentinel run a business where

6    their sales manager himself does not know that leverage is

7    being used in the SEG 1 portfolio?  Here's why:  Because they

8    didn't tell anybody.  Okay.  They didn't tell anybody.

9    Mr. Stitle testified that at the end of Sentinel when they had

10   halted redemptions and the customers were clamoring for their

11   money back, Mr. Stitle went to the defendant and said, you

12   know, there's some folks out in the lobby who sure would like

13   their money back; can we give them the securities -- we don't

14   have the cash; can we give them the securities?  And the

15   defendant said, no, they're levered; they're encumbered; we

16   can't give them back.  And do you remember, Mr. Stitle was

17   surprised.  He said, What?  How can that be?

18          Now, later during the trial, they showed Mr. Stitle

19   some e-mails where it appeared that he was discussing leverage

20   in the 125 Portfolio and he just copped to a mistake.  He

21   said, look, these e-mails were being sent to a hedge fund, not

22   somebody in the 125 Portfolio; and I misspoke when I was

23   talking about 125.  I meant Prime.  Okay.  So they got him.

24   But his testimony here was that he had no idea that there was

25   leverage being used in the SEG 1 portfolio or in the 125

Histed - Rebuttal Argument

2845

1    Portfolio.

2         Sentinel's customers, it has been pointed out to you,

3    were sophisticated.  They were players in the financial world.

4    They were used to dealing with contracts, used to dealing with

5    risky financial transactions; and so, the defense theory goes,

6    they must have known that there was leverage being used.

7         But the victims in this case, the investors at

8    Sentinel, had no way of knowing what was going on inside the

9    company.  Right?  They didn't see Sentinel's internal e-mails.

10   But you have.  The people outside Sentinel didn't hear the

11   recorded telephone calls.  You have.  Sentinel's investors

12   didn't know the truth.  But you do.  Those victims were not

13   required to forage around in boilerplate disclosures when

14   their investment adviser was holding millions of dollars of

15   their money and had important information that they wanted and

16   to which they were entitled.  And he cannot now blame the

17   victims for not being careful enough, for not reading the

18   contracts well enough.  It was his job under the regulatory

19   structure that he chose to make full disclosure to these

20   victims.  Eric Bloom did not act in good faith.

21        You'll recall that some of the victims didn't get any

22   disclosures at all.  It doesn't even matter whether the ADV

23   was good enough.  Some of them didn't get an ADV.  Remember

24   David Oulvey from SMW Trading.

25             MR. CAMPBELL:  Objection, Judge.  Objection.  That's

 1    just false, your Honor.

 2            THE COURT:  The objection is overruled for the

 3    reasons I've previously stated.

 4            MR. CAMPBELL:  Did I mishear?  Did he say that

 5    customers didn't --

 6            THE COURT:  The objection is overruled for the

 7    reasons I previously stated.  If you have an objection to make

 8    during opposing counsel's closing argument, simply make the

 9    objection on the legal basis.  Do not reargue your case during

10    your objection.

11            Proceed.

12            MR. HISTED:  Thank you, Judge.

13    BY MR. HISTED:

14            While it is true that the investment management

15    agreement contained a little clause in there that says, By

16    signing this agreement, you agree that you got the ADV, the

17    testimony from a couple of the witnesses said they didn't see

18    it.  At least they didn't remember seeing it.  Right?

19            SMW had been a customer for years, and it signed up

20    with Sentinel using the investment advisory agreement.  You

21    may recall that there was an older generation.  The investment

22    advisory agreement had no such disclosure at all.  It just

23    didn't have it.  Later they changed it to put in this

24    so-called disclosure.  But when SMW signed up, there was no

25    such provision in the contract.  And Mr. Oulvey did not recall

Histed - Rebuttal Argument

2847

 1   ever getting the ADV, nor did he recall getting or asking for

 2   the financial statements.  In other words, even if you believe

 3   the defendant, that this shrouded half-truth disclosure was

 4   sufficient -- and it wasn't -- some folks just didn't get it

 5   at all.

 6          Same with Mike Maher.  His company, Kottke

 7   Associates, had the older version of the investment advisory

 8   agreement, the one that didn't have the so-called disclosure

 9   language.  And Mr. Maher had no recollection of ever seeing

10   the ADV until it was e-mailed to him blindly on June 22nd,

11   2007.  Right?  Two months before Sentinel collapsed, he got

12   this e-mail.  Do you remember they e-mailed the ADV out to

13   everybody on June 22nd, 2007, for whatever reason.

14          Even if you believe the defense theory that leverage

15   was adequately disclosed in these forms and in these

16   contracts, some customers did not get it.  There was no

17   disclosure as to them.  And you can convict, ladies and

18   gentlemen, you can convict, on the basis of the use of these

19   folks' money without disclosing their leverage.

20          I call this next topic throwing people under the bus.

21   Is there anyone that the defendant will not blame in this

22   case?  During cross-examination or argument, you have seen the

23   accusing finger pointed at Crystal York; Jeff Logan; Matt

24   Keel, the compliance officer, right, why didn't my compliance

25   officer make me comply; T.C. Arana; Charles Mosley; the SEC,

1    whose auditors didn't check me well enough or never told me

2    there was a problem; the CFTC; the NFA; the Bank of New York;

3    and, yes, even his own customers in.  That August 13th

4    non-redemption letter, which we'll get to in a few minutes,

5    you'll see the defendant even blamed his own customers for

6    Sentinel's problems.

7         The defendant was the president and the CEO of

8    Sentinel.  He at times was its chief financial officer, its

9    chief compliance officer, its chief trader.  The defendant was

10   Sentinel.  For him to shift the blame in this case to anyone

11   else is desperate and, quite frankly, pathetic.

12        Let's talk about Mosley.  The defendant liked to

13   blame Charles Mosley.  Mosley was hired by this man.  Mosley

14   worked for this man.  Mosley was a co-schemer with that man.

15   And throughout the trial, you've heard this -- this -- about

16   how Mosley inflated his bonus somehow; how Mosley was trading

17   in the house account in a way that was advantageous to him.

18   Do you remember, Charles Mosley got 10 percent of the gains in

19   the house account as part of his contract, as part of his

20   agreement with the defendant.  This man agreed to pay Charles

21   Mosley 10 percent of the gains in the house, not in the

22   customer portfolios, but in the house.  And you've heard

23   evidence throughout the trial, in arguments, cross-examination

24   and even in the defense case that Mosley was cheating the

25   defendant; that he manipulated the cost basis of these

Histed - Rebuttal Argument

2849

1    securities to get a gain for himself.

2            But what did the defendant do when he found out?

3    Right?  What did he do?  Did he fire Mosley in January 2007 or

4    February, March, April, May, any time while Sentinel was in

5    business?  No.  Did the defendant pay him the bonus, the bonus

6    of more than $400,000 that Mosley claimed he was entitled to;

7    that the Sentinel officer said was obtained by fraud?  Yeah,

8    he paid him the bonus and kept him on the payroll.  And now to

9    point the accusing finger at Mosley as being the guy who has

10   done everything wrong and the defendant has done nothing wrong

11   here is, as I said before, desperate and pathetic.  Every

12   minute of time we spent in this trial cross-examining people

13   about what Mosley did or didn't do or about the money he got

14   in the house account was a waste of your time.

15           MR. POULOS:  Objection.

16           THE COURT:  Overruled.

17   BY MR. HISTED:

18           Blaming the auditors.  Remember the argument from

19   yesterday?  The defendant acted in good faith because he

20   relied on the auditors.  Well, folks, guess what?  There was

21   no reliance on any auditor in this case.  Okay.

22           As the judge instructed you in the beginning and I

23   anticipate he'll tell you again, the defendant has no

24   obligation to present evidence in this case, absolutely not.

25   We at the government's table bear that burden of proving

 1    beyond a reasonable doubt his guilt.  No question.  But the

 2    defendant did put on a case.  That was also his right.  He did

 3    subpoena witnesses, which was also his right.  And he had the

 4    ability to bring people in here from the accounting firms if

 5    he so choose -- chose.  Not one witness, not one speck of

 6    evidence has been presented to you -- evidence; I'm not

 7    talking about attorney argument -- that any auditor or any

 8    regulator ever knew of or blessed anything that the defendant

 9    did.

10            So when a claim is made to you that everything he did

11    was okay with the regulators, that is 100 percent false,

12    unsupported by the evidence in this case.  And the evidence in

13    this case is what must guide you, not speculation about what

14    might have been or what should have been or what could have

15    been.  There is no evidence in this case that anybody from the

16    government ever blessed the Sentinel business plan in terms of

17    what's alleged in the indictment.  Right?  No evidence that

18    anybody ever said, Your amount of leverage is fine with us.

19    There's no evidence that anybody said, Your disclosure of

20    leverage is good enough for us.  There's no evidence that

21    anybody from the government ever said, You know what, it's

22    okay with us that you're manipulating the interest rates that

23    you pay to these people, go ahead, we like what you're doing.

24    Okay.  There is none of that in this case.  Let's just be very

25    clear with this.  That argument is a smoke screen.  See

Histed - Rebuttal Argument

2851

1    through the smoke.

2              Rule 1.25 and leverage.  So that's been an issue in

3    this case.  Does Rule 1.25 permit the use of leverage?  Four

4    witnesses, four former investors sat in that chair, said they

5    thought no.  Right?  These are folks, each of whom had about

6    20 years of experience in the field, people who worked for

7    FCMs, people who currently work for FCMs, people who dealt

8    with segregated customer funds day in and day out; and they

9    all said, we did not believe that 1.25 permitted leverage; we

10   do not use leverage when we deal with 1.25 with our own

11   customer funds.

12             Howard Rothman from New York.  David Oulvey from

13   Chicago.  Julie Streit from Minneapolis.  Mike Maher from

14   Chicago.  Four different people, four different companies,

15   they all said the same thing.  Why is that?  Why is that?

16   Were they all wrong about the same topic?

17             Now, the defense claims that leverage is permitted

18   under Rule 1.25 because their witness, Paul Bjarnason, said

19   so.  Do you remember Paul Bjarnason?  He came and testified in

20   the defense case.  He's the guy, you might remember him, who

21   said Rule 1.25 permits leverage because I said so or words to

22   that effect.  He acknowledged on cross-examination that the

23   main rule, the main driving principle of 1.25 is to preserve

24   capital, to preserve capital, and to maintain liquidity.

25   That's counter -- that's counter to the use of leverage, which

Histed - Rebuttal Argument

2852

1    is using borrowed money to trade.  That's the purpose of the

2    rule.  It's written right into the rule.  He read it right

3    here.

4            He also conceded, as he must, that the word leverage

5    appears nowhere in the rule.  And then we talked about the

6    sort of transactions that were covered by Rule 1.25; repos,

7    and reverse repos.  And you remember we asked him to explain

8    that, and he described a repo and a reverse repo and said the

9    way those transactions are discussed in the rule does not

10   involve leverage.  Now, he said you could create leverage if

11   you did additional transactions beyond the wording of the

12   rule, which, of course, you could do a lot of things if you go

13   beyond the wording of the rule.

14           MR. CAMPBELL:  Objection, Judge.

15           THE COURT:  Overruled.

16   BY MR. HISTED:

17           Mr. Bjarnason was not credible.  He was not credible.

18   His testimony is contradicted by other equally knowledgeable

19   people.  He knew the Blooms back when he was working at the

20   CFTC.  He went to work for them and got paid tens of thousands

21   of dollars as their consultant when he left the CFTC.  And now

22   he came here to say, Rule 1.25 permits leverage.  You do not

23   need to credit the testimony of Paul Bjarnason.  And we

24   respectfully submit that you should not.

25           There is simply no way for me in the time that I have

1    here to chase down all of the things that you heard yesterday

2    afternoon during the closing argument.  But I want to just

3    pick out a few things and address them head-on.

4            It was suggested to you, how could the defendant not

5    have good faith if he went out and hired a compliance

6    officer -- right -- the fact that he hired a compliance

7    officer is evidence that he had good faith.  The question is

8    not why did he hire a compliance officer.  Okay.  Sentinel had

9    been around for almost 30 years.  It was regulated by two

10   different government bodies and another organization called

11   the NFA.  The question is why didn't he hire a compliance

12   officer sooner.  Right?  Sentinel had to have complied with a

13   variety of rules and regulations, complicated rules and

14   regulations.  Companies in that business have a compliance

15   officer.  The fact that he hired one after 25 years, a year

16   and a half before the company exploded, is not evidence that

17   he was operating in good faith.  Right?  The defendant himself

18   was the chief financial -- or the chief compliance officer

19   right up until they hired Matt Keel.  Is that a good idea?

20   Given the evidence we've seen in this case, I think the answer

21   is clearly no.  But the fact -- the mere fact that he hires a

22   compliance officer is not evidence of his good faith.

23           Matt Keel did not see what the defendant saw about

24   the way Sentinel worked.  He didn't see the internal e-mails.

25   He didn't have the ability to listen to the calls, and he

Histed - Rebuttal Argument

2854

1   didn't listen to the calls.  Matt Keel knew about Sentinel

2   what he told him.  Okay.  The mere fact that you've got a

3   compliance officer does not mean you're not committing a

4   crime.

5          Other various topics.  You were shown a document

6   called Defense Exhibit 101-A, a so-called due diligence

7   document that talks about leverage.  Folks, there's been no

8   evidence in this trial that any customer in the 125 Portfolio

9   ever saw that document.  Okay.  Just because the defendant

10  might have written a document for one guy at one time does not

11  mean that he was making disclosure that was real, that was

12  relevant to the people who needed it.

13         I just feel compelled to clean up another

14  misimpression that may have occurred yesterday.  This is a

15  part of a transcript that you were shown yesterday, a

16  transcript of a phone call, Government Exhibit 1412-T, for

17  transcript.

18         Yesterday Mr. Otlewski in his presentation to you was

19  quoting from some -- quoting some words from this telephone

20  call.  And then he was -- he was critiqued by Mr. Campbell

21  later for not telling you the entire truth.  That's what

22  Mr. Campbell said yesterday; that we hadn't shown you the

23  entire truth.

24         Here in the language, right here, which is where we

25  quoted -- started quoting the call, talking about pulling

Histed - Rebuttal Argument

2855

1    rates down slowly, Mr. Campbell said, look, the government

2    didn't show you the paragraph right above it.  Right?  As

3    though the government were hiding something from you.  Where

4    it says, All right.  Well, I mean, pull down the other ones.

5    I mean, get rid of the bank fee and the repo fee.

6         It was suggested to you that when we were talking

7    about pulling the rates down, we weren't talking about rates

8    paid to customers; we were talking about the bank and repo

9    fees.  That was the suggestion that was made.

10        Folks, just very briefly, I want to direct your

11   attention to the paragraph directly above that where they

12   clearly are talking about the rates paid to Group 7 and Group

13   10.  Okay.  We accurately quoted from this transcript that

14   needed to be cleared up.

15        Customer securities as collateral for the house loan.

16   Okay.  Yesterday the argument was made to you that this

17   document, Government Exhibit 134-N -- it could have been any

18   one of these documents -- was evidence that the house part of

19   the loan was collateralized by house securities.

20        This document was shown and -- like it was shown to

21   Crystal York.  You may or may not remember this part of it.

22   But up here under security cost, you see a reference to

23   $159 million for the house account.  Okay.  And the suggestion

24   was made to you that the house had its own securities that was

25   collateral for this part of the loan.  Right?  We say customer

Histed - Rebuttal Argument

2856

1    securities were used as collateral for the house part of the

2    loan.  It was suggested to you yesterday that this document is

3    evidence that the house had its own securities that were

4    collateral for the loan.  Okay?  Not true.  This says security

5    cost.  Right?  All this number says is what those securities

6    cost.

7            MR. POULOS:  Your Honor, Jeff Logan said the exact

8    opposite.  I have to object.  He is plainly misstating the

9    evidence, Judge.  I have to object.

10           THE COURT:  Your objection is overruled for the

11   reasons I have stated.

12   BY MR. HISTED:

13           You may recall that Mr. Poulos asked Crystal York a

14   series of questions that were very similar and wanted her to

15   say that this represented collateral for the house part of the

16   loan.  She did not say that.  She said, no, that's not what

17   that means.  Let us be clear.  The House Portfolio loan was

18   secured by customer securities, not by house securities.

19           That is the point that was made to you in that e-mail

20   that I showed you just a little while ago, the e-mail from

21   T.C. Arana, where she said, Hey, boss, are you sure we want to

22   be using customer securities as collateral for the house loan.

23   Right?  You just saw the e-mail.  You heard her testify about

24   that.  That's what happened.

25           Another point that was brought up yesterday, how much

Histed - Rebuttal Argument

2857

1   leverage is too much leverage.  Do you remember the house

2   account had about 20-to-1 leverage.  And the defense was

3   asking questions of the witnesses, well, that's not too much

4   leverage, is it, the question was.  And some of the witnesses

5   said, no, in the futures world, in the world of futures

6   trading, leverage of 20-to-1 is not uncommon.  I think they

7   pointed out Mr. Rothman said that.  But you may call that on

8   redirect examination, I said, Mr. Rothman, 20-to-1 leverage is

9   not too much for the futures industry, correct?  He said,

10  That's right.  But what about for a conservative cash manager

11  whose job it is is to keep those funds safe overnight; is it

12  too much leverage for that? He said, Yes.  Yes.  20-to-1

13  leverage is too much for a conservative cash manager that

14  promises safety, security and preservation of capital.

15           MR. CAMPBELL:  Judge, objection.  This is the house

16  account.

17           THE COURT:  Overruled.

18           MR. POULOS:  It's not a customer portfolio.

19  BY MR. HISTED:

20           I'm just pointing out the questions that were raised

21  yesterday.

22           Securities that were purchased that were unsuitable

23  for customer -- customer accounts.  You may recall that there

24  was evidence, Government Exhibit 1525, Anne Vanderkamp from

25  Mesirow explained this to us and pointed out that

1  approximately -- conservatively -- $80 million had been spent

2  by Sentinel for these PreTSL income notes.  You remember these

3  income notes; they're not suitable for any customer portfolio

4  because they have no rating.  Right?  These are the securities

5  that have no rating and can't be put in customer portfolios.

6  And, again, we never said they were.  Right?  The point here

7  is simply that Sentinel never had $80 million.  Sentinel never

8  had more than $20 million, according to its own records that

9  you've seen in this case.  How does Sentinel buy $80 million

10  worth of PreTSL income notes that it allocated to the house?

11  I think you know the answer.  It's a reasonable inference that

12  they used the customers' money for that or credit secured by

13  securities belonging to the customers.

14         This point is emphasized all the more by a defense

15  exhibit.  You may recall a witness named Greg Kyle.  Greg Kyle

16  was called by the defense to explain the quality -- the high

17  quality of the securities that had been allocated to the

18  customers.  Again, we never had any quarrel with that.  We

19  never said that the customer accounts had improper securities.

20  But in the course of doing his analysis, Mr. Kyle shared with

21  us that as of July 11th, 2007 -- July 11th, 2007, a month

22  before Sentinel went under -- Sentinel had $111 million worth

23  of non-rated securities.  Right?  Now, that was sort of

24  startling given that Mr. Poulos had cross-examined Matt Keel

25  and had tried to get Matt Keel to acknowledge that all of

Histed - Rebuttal Argument

2859

1    these securities that they had bought had been sold long

2    before this time.  And then Mr. Kyle comes out with this

3    surprise.  A month before Sentinel imploded, it had

4    $111 million of non-rated securities.  More surprising was

5    that $25 million of those non-rated, unsuitable for customer

6    securities had, in fact, been allocated by Sentinel to the SEG

7    3 customer portfolio.  This is a defense exhibit.  This is his

8    analysis of the SEG 3 portfolio.

9         Sentinel used its customers' funds to buy securities

10   for itself.  Why?  These income notes, as you heard from the

11   testimony, threw off a lot of interest.  They made a lot of

12   money for people in the house account, the defendant and his

13   family.

14        Setting the interest rates.  I think we've covered

15   this well.  I'm not going to spend a lot of time with this.

16   There is no doubt that this is what happened at Sentinel for

17   years and years and years.  Yesterday it was suggested to you

18   that you should not base a conviction on ambiguous evidence.

19   But you can base a conviction on overwhelming evidence.

20   Folks, there is an avalanche of evidence that this is what

21   they were doing.

22        You've got the e-mail from Charles Mosley to the

23   defendant, which I just showed you, as far back as October

24   of 2005 telling him where he had set the interest rates for

25   the FCM group, Group 7.  And then if you -- when you go back

1    and look at these exhibits, you're going to see, I

2    respectfully submit, dozens of e-mails from Crystal York to

3    the defendant telling him where the rates had been set.  Okay.

4           You've heard testimony from T.C. Arana, who said she

5    was aware -- she became aware that the defendant was taking --

6    or people who worked for him, people who were under his

7    authority -- taking money from the SEG 3 customers and from

8    the house and giving it to SEG 1.  She testified to that.

9    There was an e-mail.  She showed -- she showed us an e-mail.

10   Matt Keel also discussed that -- right -- multiple times with

11   the defendant.

12          As if this were not enough -- the e-mails, the

13   spreadsheets, the testimony from Crystal, from Jeff, from T.C.

14   and from Matt -- as if that wasn't enough, and most certainly

15   it is, there are the four telephone calls, the recorded calls.

16   There are four recorded calls, two between the defendant and

17   Charles Mosley and two between the defendant and Crystal York.

18   Now, the defense challenged you to go back and listen to those

19   calls.  We join in that request.  Please do.  You will hear

20   Crystal saying, Boss, I set this group here, I set this group

21   there, is that okay with you.  And after some back and forth

22   and discussion and debate about how Sentinel needed to beat

23   the competition and the defendant was worried that they

24   weren't going to beat the competition unless they goosed up

25   that interest rate, he said Yeah, go ahead and do that.

Histed - Rebuttal Argument

2861

1    Listen to the call, the July 30th, 2007, call.  There is an
2    avalanche of evidence about rate setting.  I won't spend any
3    more time on that.
4            And, again, if you find that that aspect of the
5    scheme has been proven -- and it most surely has -- you should
6    convict.  The scheme has been established; the scheme as to
7    putting customer funds at risk by pledging them as collateral,
8    the scheme as to setting the interest rates, abundantly
9    proven.  You've got ample evidence to convict right now.
10           Let's talk about the timing of the events, the
11   timeline, the sequence of events.  The timeline is a powerful
12   tool.  And the timeline is fatal to the defendant's claim of
13   good faith in this case.
14           We know that by July 2nd, 2007, Sentinel was
15   experiencing a lot of financial stress.  Right?  Couldn't send
16   the wires out.  Repo counterparties had pushed securities back
17   and demanded hundreds of millions of dollars in cash.  True,
18   the defendant was off in Africa.  So what?  How many times
19   have we heard, the defendant was in Africa; he couldn't
20   possibly have anything to do with this.  That's just silly.
21           First of all, you have recorded calls from the
22   defendant while he's in Africa.  So let's forget about that.
23   And, secondly, even if he took a vacation from a long-running
24   fraud, he can still participate in it.  So let's just get this
25   off the table.  I was vacationing in Wyoming; I didn't know.

Histed - Rebuttal Argument

2862

1    I was, you know, spending afternoons with my kids; I didn't

2    know.  That's nonsense.

3            But that's the timeline.  July 2nd, we know from the

4    recorded calls that he knew Sentinel was in dire financial

5    straits.  July 18th, his father takes out his entire stake,

6    down to the penny, from the company that he founded.  Phil

7    Bloom took out his 5.6 million and his wife's 5.6 million, the

8    defendant's mother.  Took out all their money on July 18th.

9            Guess what happens on July 24th?  A new customer, Man

10   Financial, sends in $50 million.  That's outrageous.  That is

11   outrageous to take $50 million from a brand new customer in

12   the SEG 1 super protected customer segregated fund portfolio

13   when the founder has just taken every dime of his money out of

14   the company.  That's a cash grab.

15           What else happens on July 24th?  The defendant asked

16   for a raise.  Right?  A raise.  Do remember this e-mail,

17   Government Exhibit 625?  Down at the bottom, T.C. is talking

18   to the defendant on June -- or July 24th, the same day Man

19   Financial shoves its $50 million in.  T.C. is talking about

20   his bonus.  They talk about the bonus.  He says, Yeah, yeah,

21   whatever.  And on that note, can you give me a retroactive

22   raise please to $200,000?  It's ridiculous.

23           Sentinel was sinking like the Titanic.  Except

24   Captain Smith went down with the Titanic.  This guy sailed off

25   leaving the passengers on board and blaming them for

Histed - Rebuttal Argument

2863

1    Sentinel's financial downfall.

2           Moving ahead in time.  Things are getting stressful

3    and hot.  And that takes us to August 3rd.  Do you remember

4    the assertion made yesterday that the financial crisis really

5    didn't hit until August 9th?  That's the exact day,

6    apparently, that the liquidity crisis started.  And it was two

7    business days later that the defendant voluntarily halted

8    redemptions.  That's the assertion that was made.

9           First of all, let's pause here and talk about

10   voluntarily halting redemptions.  Okay.  How do you

11   voluntarily not give your customer their money back?  Okay.

12   Is that something you just decide you can do?  I mean, the

13   notion that I voluntarily decided not to return my customers'

14   funds is offensive.

15          But let's go back to the timeline.  It wasn't

16   August 9th that they were aware of their financial problems.

17   They were aware of them long before then.  You heard the

18   calls.  Long before August 3rd, which I'm about to discuss

19   with you, they were discussing incoming customer funds.  We

20   need incoming customer funds just to pay the loan.  Right?

21   They knew they were having problems.

22          You were shown this stipulation yesterday.  Calling

23   your attention to the Scott Bakal stipulation,

24   paragraph three.  On August 3rd, Phil Bloom called Bakal to

25   talk about concerns that Phil had with Sentinel customer Lake

 1    Shore Asset Management.  You may remember that their funds had

 2    been frozen at Sentinel by the government regulators,

 3    unrelated to this matter.  Phil called Bakal because he was

 4    concerned about Sentinel's loan from the Bank of New York and

 5    obtaining adequate financing.  Okay.

 6          Sentinel was concerned on August 3rd about these

 7    matters.  And later that day, Bakal requested and received

 8    Sentinel's financial statements and its Form ADV.  Okay.  So

 9    even though it was pointed out yesterday that Scott Bakal was

10    only a tax attorney, he's the attorney the Blooms called when

11    they wanted help with this problem.  Right?  What they won't

12    do now to diminish his involvement and his role and to write

13    him off only as a tax lawyer.  He was the go-to guy, at least

14    for the Blooms at that time.  And he was gathering

15    information.

16          The next day, Saturday, August 4th, attorney Bakal

17    sent an e-mail, You should hold off taking any additional

18    deposits until we get some of these issues worked out, even

19    from existing customers.  If any redemption requests come in,

20    let me know.  They may need to wait until you can confirm the

21    NAV, the N-A-V, defined below as net asset value.  It is

22    essential that anything you tell people be 100 percent

23    accurate.  Better to say nothing if you can't give a

24    100 percent accurate answer.

25          Later then, that day and all the following days,

1    Mr. Bakal, the attorney, starts to gather more information.

2    Right?  He's not just shooting from the hip.  He's not just

3    giving unsolicited, unpractical -- impractical advice.  He's

4    gathering financial records, disclosure records, customer

5    agreements.  He has a discussion with the defendant and his

6    father on the evening of Sunday, August 5th.

7          And Monday, August 6th, as was pointed out to you

8    yesterday, the defendant continues to take tens of millions --

9    maybe more than a hundred million dollars from Sentinel

10    customers.  The wire transfers that are charged in the

11    indictment in this case, the money coming in, are all

12    transfers that happened this week, August 6th through the end

13    of the week.  Okay?  There can be no doubt, ladies and

14    gentlemen, that when these wire transfers happened, when these

15    people were sending in tens of millions of dollars, Sentinel

16    knew -- he knew -- that their money was at risk, grave risk.

17          Tuesday, August 7th, the attorney receives a leverage

18    report, July 27th, 2007, leverage report.  He's educating

19    himself.  The attorney is not just shooting from the hip.  He

20    understands the situation that Sentinel is in now.  And on

21    August 7th, recognizing the dire financial straits, he sends a

22    letter to the defendant and his father and says, I need an

23    advance retainer if I'm going to keep working for you because

24    an asset freeze could be in your future.  And if there's ever

25    a danger sign that goes off to a cash manager, it's their

Histed - Rebuttal Argument

2866

1   attorney saying your assets could be frozen.  And what did the

2   defendant do?  Kept taking money from the customers.

3           The next day, August 8th, the attorney tells Phil

4   Bloom, the situation is so bad, you need to shut down.  Shut

5   it down and call the regulators.  Phil said no; I want to get

6   a second opinion.  That's okay.  That's all right.  People are

7   entitled to second opinions.  But what they're not entitled to

8   do is to keep taking money from their customers, which is what

9   they did.  In the indictment you'll see wire transfers on

10  August 8th and 9th and 10th.  Okay?  The defendant took money

11  from these people knowing that it was not safe anymore.

12          Sentinel was not a victim of the credit crisis.

13  Their scam and their scheme had been going on for years prior

14  to that.  The financial crisis did not cause the fraud.  It

15  cannot excuse the fraud.  It merely exposed the fraud.

16          And then the August 13th letter, the non-redemption

17  letter that the defendant sent out.  You can read it for

18  yourself.  It essentially blames Sentinel's customers for

19  joining in market panic.  We had previously thought that the

20  market would return to some semblance of order and that our

21  clients would not join in the panic.  Unfortunately that's not

22  been the case.  So now we can't meet any significant

23  redemption requests.

24          How dare you blame these people whose money you're

25  holding in trust for causing these problems.  And I should

Histed - Rebuttal Argument

1    note that in this letter, the defendant says, We've been

2    studying the liquidity crisis for the past several weeks.

3    This is August 13th.  The past several weeks.  Yesterday it

4    was suggested to you that this financial crisis came out of

5    nowhere on the 9th and the defendant immediately shut down.

6    No.  Even according to this letter, they were studying these

7    events in late July.

8            Until the inevitable happened:  The Bank of New York

9    called the loan.  This is Government Exhibit 219 admitted by

10   stipulation.  August 17th, the bank said, guess what, you

11   failed to pay the loan, we're taking your securities.  And

12   attached to this letter -- and you'll see it in the exhibits

13   that you get -- was a list of 80 securities with a face value

14   of more than $400 million.  $400 million.  That money didn't

15   belong to him.  It belonged to the customers.  And the bank

16   took it.  They had a lawful right to because he put it in

17   lienable accounts.  Right?  He had pledged it as security.

18   There's nothing --

19           MR. CAMPBELL:  I have to object.  That's not what the

20   stipulation said.  They were not allowed to take it.

21           THE COURT:  The objection is overruled.  The jury

22   will have the stipulation.

23   BY MR. HISTED:

24           This is not a hypothetical loss.  We're not asking

25   anybody to second-guess somebody else's judgment.  The

1   defendant put this money at risk.  Not a metaphysical risk.  A

2   real risk.  And it's gone.

3         The defendant held Sentinel out as a fortress.

4   Sentinel was a house of cards in a hurricane.  That's what it

5   was.  And when things got hard, it blew away.

6         This case is very simple.  A lot of the jargon has

7   been hard to understand, but it's very simple.  The wires, the

8   wire transmissions that effectuated this scheme, that carried

9   it out, are from July 30th, when the defendant got on the

10  phone with Crystal York and set the rates.  Okay.  You have

11  the call.  Easy to understand.  Once you -- if you come to the

12  conclusion that they set the rates that day, all of the

13  account statements dated July 30th are false.  And they are

14  false.  That dispenses with the whole section of the wires.

15        The August 13th wires.  Again, account statements.

16  Again, false.  The evidence has been that Sentinel on a daily

17  basis every day, each and every day, set the account -- set

18  the interest rates for its customers.  And that's true for

19  August 13th.  And also on this day, customer securities were

20  in lienable accounts.  That was not disclosed to the

21  customers.  Okay.  All those August 13th account statements,

22  they are wires in furtherance of the scheme.

23        The scheme has been established; the scheme to impair

24  and put their money at risk, the scheme to set the interest

25  rates and the scheme to keep taking money in and to keep lying

1   to customers when you knew they couldn't keep it safe.  That's

2   the scheme.  Find any one of those things and the scheme is

3   established.

4          And the third section of wires are incoming wire

5   transfers that came into Sentinel during that last week of its

6   existence when it knew or should have known -- did know --

7   that it could not keep their customer funds safe.

8          And there's also one other count, which is a wire

9   that was sent in from -- from a European customer.

10          Ladies and gentlemen, I'm done talking.  We have

11   proven this case beyond a reasonable doubt.  It's in black and

12   white in the documents.  It's in the recordings.  It's in the

13   testimony.  The recordings that are in the voice and in the

14   words of that man sitting right there.

15          You're going to get a verdict form.  And we're going

16   to ask you to look at the documents, look at the evidence,

17   examine it, examine the evidence with confidence because the

18   evidence is there and it is sufficient and we want you to talk

19   about it and study it and examine it and hold us to our

20   burden, the burden that we've met.  And then I'm asking you,

21   each of you, to sign the verdict form and to come back in and

22   let this man right here know that you have seen through the

23   smoke.  You know what he did.  We're asking you to find him

24   guilty.

25     (End of excerpt.)

2870

1                              * * * * *

2

3    I certify that the foregoing is a correct excerpt from the
     record of proceedings in the above-entitled matter.
4

5
     /s/ Nancy C. LaBella          April 21, 2014
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25